# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE MARTINEZ,<br><br>          Petitioner,<br><br>    v.<br><br>JAMES HARTLEY, Warden,<br><br>          Respondent. | 1:08-cv-00874 OWW YNP [DLB] (HC)<br><br>FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**BACKGROUND**

Petitioner was sentenced to 15 years to life in prison after being convicted of second-degree murder in the Los Angeles Superior Court. (Answer, 1.) Petitioner was committed to prison on September 8, 1987 with a minimum eligible parole date of September 7, 1997. (Pet. Ex. A, Tr. of Parole Board Hr'g, 1, March 2, 2005.) The Board of Parole Hearings (the Board) granted Petitioner parole but the Governor of California reversed the grant. (Pet. Ex. B, Indeterminate Sentence Parole Release Review, 1.)

Petitioner filed a petition for writ of habeas corpus in the Superior Court challenging the Governor's reversal on February 17, 2006. (Pet. Ex. E, Superior Ct. Decision, April 20, 2007.) The court denied the petition on the basis that Petitioner's commitment offense alone was sufficient evidence on which the Governor could rely to reverse the grant. (Id. at 2.) Petitioner filed petitions

for writ of habeas corpus with the California Court of Appeal and the California Supreme Court. The appellate court denied the petition holding that there was "more than a 'modicum of evidence' to support the Governor's decision". (Pet. Ex. I, Order of the Ct. of CA Second Appellate District Division Five, Sept. 6, 2007.) The California Supreme Court denied the petition without comment. (Pet. Ex. J, Order of the Supreme Ct. of CA, April 30, 2008.)

Petitioner filed the instant petition with the United States District Court claiming that his due process rights were violated when the Governor relied solely on the commitment offense to reverse Petitioner's grant of parole. (Doc. #1.)

## FACTUAL BACKGROUND

The Commitment Offense[1]

On May 7, 1986, Petitioner, who was 19 years old at the time, was riding his bicycle while under the influence of alcohol. Petitioner encountered the victim and flashed a gang sign; the victim flashed a gang sign back that indicated that he was from a rival gang. Petitioner was unsure of which sign the victim flashed so he asked the victim where he was from, i.e. what gang did he belong to. When the victim answered "18th Street," Petitioner pulled out a gun and shot the victim four times. The victim was pronounced dead upon arrival to the hospital. Petitioner was arrested that same day and confessed about six hours later. It was later discovered that the victim was not known to be affiliated with any gang.

Petitioner did not know the victim nor had he ever seen the victim before. Petitioner does not contend that he shot the victim out of self defense. When questioned why Petitioner shot the victim, Petitioner explained that his gang and the 18th Street gang were rivals and members of the 18th Street gang had shot a member of Petitioner's gang the previous year. Petitioner admits that he shot the victim out of retaliation and gang loyalty.

Pre-Conviction Facts

Petitioner grew up in a broken home and joined a gang at the age of 11. (Pet. Ex. A, 20.) In 1981, Petitioner was arrested for sniffing glue at the age of 14. (Id. at 23.) In 1983, at the age of

---

[1] All facts are taken from the Transcript of the Parole Board Hearing. (Pet. Ex. A.)

16, Petitioner was arrested for burglary of a construction site and was given probation. (Id. at 23-25.) Later that year, Petitioner was arrested for possession of PCP, (Id. at 25) and then again for carrying a concealed weapon–a four inch buck knife. (Id. at 25-26.) In 1984, Petitioner was once again arrested for possession of PCP for sale. (Id. at 26.) In 1985, at age 17, Petitioner was arrested for misdemeanor vandalism when he wrote on a school vending machine with a marking pen. (Id. at 27-28.)

Post-Conviction Facts

Petitioner has only been disciplined twice since his incarceration, once for mutual combat and once for delaying lockup. (Id. at 51.) Both offenses took place during Petitioner's first year of prison and he has been discipline free since 1988. (Id.)

While in prison, Petitioner has never participated in any gang activity nor has he been on record as affiliating with any gang. Petitioner admits that he broke any and all gang affiliation by 1993. When asked how he managed to stay away from gangs, Petitioner said that he realized his time in prison had to be all about reforming and getting out so he pulled away from the gangs and started spending more time in his cell to get away from the violence and aggression. (Id. at 66-67.)

Petitioner currently works at the Canteen where he has worked his way up from stock boy to lead clerk over the past two years. (Id. at 58.) The Canteen Manager, Petitioner's supervisor, wrote a letter of support to the Board saying that Petitioner is "very hard working, polite, self-motivated and not hesitant to take initiative when there is work to be done." (Id.) He further states that Petitioner "has a positive working relationship with staff and his fellow employees." (Id. at 58-59.)

Petitioner has completed vocational training in air conditioning and refrigeration and has received an EPA § 608 Universal Technician Certificate in refrigeration handling. (Id. at 52.)

Petitioner has participated in several self-help programs in prison including: Alcoholics Anonymous/Narcotics Anonymous, the Youth Adult Awareness program, the Education, Awareness, Gain, Life Empowerment (EAGLE) program, and the Life Development Skills program. (Id. at 63.) Petitioner is a facilitator for the Life Development Skills program where he takes over if the instructor is busy and teaches the class. (Id.) Furthermore, Petitioner has received his GED while in prison, (Id.

U.S. District Court
E. D. California

3

at 101) participated in the Children's Christmas Holiday Festival in 1993, (Id. at 65) and was a Laubac Literacy Tutor where he helped fellow inmates learn to read (Id. at 64).

Petitioner testified to the Board that "[b]eing a murderer is disgusting. There is no word that can fully describe that feeling." (Id. 95.) Petitioner goes one to acknowledge the damage that his crime did to the victim's family and to the community. (Id. at 94.) Petitioner talks about how incarceration gave him insight into the person that he wants to be and how prison taught him how to respect others and how to participate in society. (Id. 80-81.) Petitioner also wrote a letter of apology to the victim's family expressing his remorse for what he did to them and that he wanted to make amends to the victim's mother. (Id. at 60.)

Petitioner has kept in contact with his family throughout the duration of his incarceration. His brother visits him about every three months (Id. at 31) and brings their mother about once every six months (Id. at 33).

Petitioner's post-conviction progress reports have given him a classification score of 19 ever since 1996. (Id. at 51.) 19 is the most desirable classification score an inmate with a life sentence can ever receive. (Id. at 51-52.)

Post-Commitment Plans

Petitioner plans to live with his brother and his brother's family when he is released. (Id. at 38.) Petitioner's brother works at an auto repair shop and has a job lined up for Petitioner at the shop working on air conditioners. (Id. at 41-42.) Petitioner's brother and the owner of the auto repair shop both sent letters of support to the Board confirming the employment offer and relaying their support of Petitioner's release. (Id. at 41-43.)

Petitioner's sister also wrote a letter of support assuring the Board that she would be happy to have Petitioner come live with her and help him out with food, clothing, and funds. (Id. at 45-46.)

Luther Jenkins, a pharmacist in Los Angels and a friend to Petitioner's family, wrote a letter of support saying that he would be happy to hire Petitioner if he needed a job. (Id. at 47.)

Further letters of support were sent to the Board by Petitioner's Godmother and the Deacon of the Holy Family church in Hesperia. (Id. 43-45.) All of the letters of support read into the record

praised Petitioner for the changes he has made during his incarceration. (Id. at 41-47.)

Psychological Evaluations

All of Petitioner's psychological reports as far back as 1999 have been supportive of his release. (Id. at 93.) In this hearing, the Board relied on a psychological evaluation prepared by Charles Silverstein on April 12, 2003. (Id. at 65.) Mr. Silverstein issued only one ongoing recommendation, which was that Petitioner continue to attend Alcoholic Anonymous. (Id. at 69.) The report goes on to note that Petitioner has "engaged in numerous pro-social activities" in prison and that due to Petitioner's "age, lack of prior criminal conduct, lack of mental health problems, stable work history and lack of any disciplinary actions and generally good adjustment would be encouraging indicators for a positive outcome on parole." (Id. at 71.) Mr. Silverstein notes that Petitioner's history with alcohol abuse and gang activity appear to be the most negative indicators in Petitioner's record. However, in light of Petitioner's overall positive record, Mr. Silverstein estimates that Petitioner's "potential for dangerousness, as compared to other inmates is considerably below average. His potential for dangerousness, as compared to the non-inmate population in the community is probably no more than average, if free of alcohol, substance abuse or gang affiliation." (Id. at 71-72.)

**DISCUSSION**

I. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the deprivation in question arose out of Avenal State Prison, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d). Accordingly, the Court has jurisdiction over the action.

II. Legal Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996)) (overruled on other grounds by Lindh, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment)). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

This Court may entertain a petition for writ of habeas corpus on "behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer v. Andrade, 538 U.S. 63, 70-71; see also Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id. (quoting Williams, 592 U.S. at 412). "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of

materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and we are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir. 2002).

In this case, Petitioner claims that his due process rights were violated when the Governor reversed his parole grant and it is our job to determine whether the state court's decision upholding that reversal in contrary to or involves an unreasonable application of federal law. If the Court determines that the state has indeed deprived the petitioner of a liberty or property interest without sufficient due process, habeas relief can only be granted if that deprivation was contrary to or an unreasonable application of federal law. Carey v. Musladin, 549 U.S. 70 (2006); Williams, 529 U.S. at 410-12.

III. <u>Review of Petitioner's Claim</u>

Petitioner claims that the Governor unconstitutionally reversed his grant of parole. The Supreme Court, by its "silent order" denying review, is presumed to have denied the claims presented for the same reasons stated in the opinion of the lower court. <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991). The last reasoned decision in this case was that of the Superior Court denying Petitioner's petition for writ of habeas corpus. The Court must therefore examine whether the Superior Court's ruling was contrary to or an unreasonable application of clearly established Federal law.

Under California law, the Governor must consider the same factors the Board is required to consider when deciding whether to reverse a grant of parole. <u>See</u> Cal. Const. art. V § 8(b); <u>In re Rosenkrantz</u>, 29 Cal.4th 616, 664 (Cal. 2002); <u>see also</u> <u>McQuillion v. Duncan</u>, 306 F.3d 895, 1015 (9th Cir. 2002). Thus, the Governor's decision to reverse a parole grant will be reviewed under the same procedural due process principles used to review challenges to the Board's denial of parole.

Due process claims require a two step analysis; whether the state has deprived the prisoner of a liberty or property interest and, if so, whether the procedures accompanying that deprivation were constitutionally sufficient. <u>Ky. Dep't of Corrections v. Thompson</u>, 490 U.S. 454, 460 (1989); <u>Sass v. Cal. Bd. of Prison Terms</u>, 461 F.3d 1123, 1127 (9th Cir. 2006). The United States Constitution does not, by itself, create a protected liberty interest in a parole date. <u>Jago v. Van Curen</u>, 454 U.S. 14, 17-21 (1981). In Respondent's answer, Respondent argues that Petitioner does not have a liberty interest in parole despite recognizing the existence of Ninth Circuit authority to the contrary. (Answer, 3). The Ninth Circuit has consistently held that prisoners whose sentence provides for the possibility of parole have "a liberty interest that is protected by the procedural safeguards of the Due Process Clause." <u>Irons v. Carey</u>, 505 F.3d 846, 850 (9th Cir. 2007); <u>see also</u> <u>McQuillion</u>, 306 F.3d at 903; <u>Biggs v. Terhune</u>, 334 F.3d 910, 914 (9th Cir. 2003). Consequently, the Court finds that Petitioner has a protected liberty interest in a parole date.

A finding that a liberty interest exists does not end the Court's inquiry as the Due Process Clause is not violated where the denial of a petitioner's liberty interests follows the State's observance

of certain procedural safeguards. See Greenholtz, 442 U.S. at 12. "The Supreme Court has clearly established that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by 'some evidence in the record,' or is 'otherwise arbitrary.'" Irons, 505 F.3d at 851 (quoting Superintendent, Mass. Corr. Inst., Walpole v. Hill, 472 U.S. 445, 457 (1985)). The "some evidence" analysis is "framed by the statutes and regulations governing parole suitability determinations in the relevant state." Id. (citing Biggs, 334 F.3d at 915). "Accordingly, here we must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by 'some evidence'. . . . constituted an unreasonable application" of the standard articulated in Hill. Id.

California law provides that after an eligible life prisoner has served the minimum term of confinement required by statute, the Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for" the prisoner. Cal. Penal Code § 3041(b). "[I]f in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison," the prisoner must be found unsuitable and denied parole. Cal. Code Regs., tit. 15, § 2402(a); see In re Dannenberg, 34 Cal.4th 1061, 1078-1080 (Cal. 2005). The Board decides whether a prisoner is presently too much of a risk to be suitable for parole by applying factors set forth in the California Code of Regulations. See Cal. Code Regs., tit. 15, § 2402; Irons, 505 F.3d at 851-852; Biggs, 334 F.3d at 915-916. The regulations permit consideration of "all relevant, reliable information available to the panel," and explicitly call for consideration of "the base and other commitment offenses, including behavior before, during and after the crime."[2] Cal. Code Regs., tit. 15, § 2402(b). Factors

---

[2] The statute specifically states: "All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstance which taken alone may not firmly establish unsuitability for parole may contribute

tending to support a finding of unsuitability for parole include: the underlying offense was carried out in an "especially heinous, atrocious or cruel manner"; a record, prior to incarceration for the underlying offense, of violence; a history of unstable relationships with others; and serious misconduct while incarcerated. Cal. Code Regs., tit. 15, § 2402 (c); see also In re Shaputis, 44 Cal.4th 1241, 1257 n. 14 (Cal. 2008). However helpful the above factors may be in ascertaining whether an inmate is suitable for parole, the threshold questions remains whether "some evidence" supports the finding that the petitioner poses a current risk of danger to society–a mere recitation of those factors is not enough to answer such an individualized inquiry. See In re Lawrence, 44 Cal.4th 1181, 1212 (Cal. 2008).

In this case, the Governor reversed Petitioner's parole grant because "the gravity alone of this murder is enough for me to conclude at this time that [Petitioner's] release from prison would pose an unreasonable public-safety risk." (Pet. Ex. B, 2.) In deciding that "the gravity of the second-degree murder. . . . outweighs the positive factors supporting" Petitioner's release (Id.), the Governor gave weight to the Los Angeles County District Attorney's Office's argument that the murder was particularly egregious because the only motive Petitioner had to kill the victim was the fact that the victim claimed to be a rival gang member and that Petitioner had a prior criminal record. (Id.) The Governor further cited to the sentencing court's characterization of the murder as cold blooded because Petitioner had "not a second's reflection on the thought that he [was] taking another boy's life away." (Id.) The Superior Court denied Petitioner's habeas petition finding that "Petitioner committed this second-degree murder in a more aggravated and violent manner than ordinarily shown in the commission of that offense. . . . Therefore, there is some evidence that petitioner demonstrated exceptionally callous disregard for human suffering in the commitment of the offense.'" (Pet. Ex. E, 2.) As mentioned several times above, the proper standard by which to review the Governor's reversal of a parole grant is whether Petitioner poses a current risk of danger to society, not whether Petitioner's commitment offense demonstrated a an exceptionally callous disregard for human suffering. At no point in its decision did the Superior Court examine the record to determine what

---

to a pattern which results in a finding of unsuitability." Cal. Code Regs., tit. 15, § 2402(b).

risk Petitioner presently poses; however, even if the Superior Court had articulated the proper standard of review, the Court finds no evidence that supports the Governor's finding that Petitioner poses a current risk of danger. Butler v. Curry, 528 F.3d 624, 641 (9th Cir. 2008) (holding that, after concluding that the lower court's decision was contrary to clearly established Supreme Court precedent, the Court must then make a finding as to whether the petitioner's constitutional rights have actually been violated.)

> [A]lthough the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission fo the commitment offense remain probative to the statutory determination of a continuing threat to public safety.

In re Lawrence, 44 Cal.4th at 1214 (emphasis in original). While the Governor and the Superior Court both rely solely on Petitioner's commitment offense, neither speak to why the offense is still predictive of current dangerousness nearly two decades later. The Superior Court claims that the nature of the commitment offense shows that Petitioner "demonstrates an exceptionally callous disregard for human suffering;" but at no point does the court point to a single piece of evidence in the record probative of Petitioner still harboring such a callous disregard. The record indicates that Petitioner did not have a history of violence prior to the murder and has only a single incident of violence in prison that occurred during his first year; thus, this Court sees no correlation between the Superior Court's reliance on Petitioner's commitment offense and the finding that Petitioner poses a current threat of dangerousness.

Likewise, there is nothing in the record to support an inference that the Superior Court relied on some other evidence, not articulated in its decision, to uphold the Governor's reversal. The Governor wrote that "the gravity alone of [the] murder is enough" to find that Petitioner currently poses an unreasonable risk of danger to the society, but the only support he offered for this finding was the "cold bloodedness" of the murder, Petitioner's lack of reflection *at the time* of the murder, and the fact that the murder was motivated by gang loyalty.

There is no evidence past the date of the murder that provides a nexus between these facts and a finding that Petitioner poses a current risk of danger. The record shows no sign of "cold bloodedness" on the part of the Petitioner during his time in prison–as mentioned above, he only has a minor and attenuated disciplinary record.

The record also fails to support a finding that Petitioner currently lacks reflection on the idea that he took another person's life. Petitioner spoke throughout the hearing about his remorse for his actions, the effect the victim's death must have had on the victim's family and community, and the effect that the act of taking another man's life had on Petitioner himself.

Furthermore, there is no evidence to lead one to believe that Petitioner might be tempted to join a gang if released. Petitioner has no record of gang activity in prison and the record indicates that any loose affiliation Petitioner might have had with any gang was broken by 1993.

The Governor's reversal does mention the fact that Petitioner claimed that the killing was done in self defense until the 1990's but then goes on to note that Petitioner "has since then maintained that he accepts full responsibility and has remorse for [victim]'s murder." (Pet. Ex. B, 2.) There is no evidence to support an inference that Petitioner is currently dangerous because he has not admitted the severity of or taken full responsibility for the murder. While the underlying offense may indeed have been grave, the standard by which the Governor must review the parole grant is whether Petitioner poses a current risk of danger to society, not whether he was dangerous at some point in the past–the Governor points to no evidence of the former.

Accordingly, because the Superior Court did not cite to a single fact in the record demonstrating Petitioner's current dangerousness, we find that the court unreasonably applied the clearly established "some evidence" standard. Furthermore, even if the Superior Court had articulated the correct standard, this Court finds no evidence in the record to support the Governor's finding that Petitioner poses a current risk of danger to society.

## CONCLUSION

For the reasons set forth above, we find that the Petitioner is being held in violation of the Constitution and that the Superior Court's application of the "some evidence" standard is

objectionably unreasonable.

## RECOMMENDATION

Accordingly, the Court HEREBY RECOMMENDS that:

1) Petitioner's petition for writ of habeas corpus be GRANTED;

2) Petitioner should be released on parole immediately; and

3) The CDCR should be DIRECTED to credit the number of days from the date of the Governor's reversal (July 19, 2005) to the day Petitioner is released towards Petitioner's parole sentence.

This Findings and Recommendation is submitted to the Honorable Oliver W. Wanger, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the Objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the Objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **December 23, 2009**          **/s/ Dennis L. Beck**
UNITED STATES MAGISTRATE JUDGE